1    WO

2

3

4

5

6              IN THE UNITED STATES DISTRICT COURT

7                  FOR THE DISTRICT OF ARIZONA

8

9    Sylvia Janine Ojala,                    No. CV-16-1876-PHX-DMF

10                    Plaintiff,

11   v.                                      **MEMORANDUM AND ORDER**

12   Commissioner of Social Security
     Administration.
13
                      Defendant.
14

15

16         Plaintiff Sylvia Janine Ojala ("Claimant") appeals the Commissioner of the Social

17   Security Administration's decision to adopt Administrative Law Judge Thomas Cheffins'

18   (ALJ's) ruling denying her application for Disability Insurance Benefits pursuant to Title

19   II of the Social Security Act. (Doc. 1 at 1-10)[1] Claimant argues the ALJ erred by

20   improperly rejecting the assessments of Claimant's treating psychiatrist, and by rejecting

21   her own symptom testimony. (Doc. 16 at 1)

22         This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and with the parties'

23   consent to Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c). For the reasons

24   set forth below, the Court orders the decision of the Commissioner of Social Security

25   vacated and remands this matter to the Commissioner for an award of benefits.

26

27   _____

28       [1] Cites to the record indicate documents as displayed in the Official Court
     Electronic Document Filing System maintained by the District of Arizona.

## I.  BACKGROUND

### A.  Claimant's Application and Social Security Administration Review

Claimant was 47 when she filed her application for disability benefits on February 16, 2012, alleging a disability onset date of December 31, 2009.  (Docs. 10-4 at 2, 10-6 at 4)  Claimant asserted in her application a disabling diagnosis of major depressive disorder, generalized anxiety, and post-traumatic stress disorder.  (Doc. 10-4 at 3)  Her application was initially denied by the state agency on August 30, 2012 (*Id*. at 2-17) and again upon reconsideration on April 15, 2013 (*Id.* at 18-29).  The ALJ conducted a hearing on Claimant's application on September 25, 2014.  (Doc 10-3 at 47-78)  The ALJ filed a notice of an unfavorable decision on November 19, 2014.  (*Id.* at 17-41)  Claimant requested review by the Appeals Council (*Id.* at 8-15), which was denied on April 11, 2016.  (*Id.* at 2-4)  At that point, the Commissioner's decision became final. *Brewes v. Comm'r of Soc. Sec. Admin.*, 682 F.3d 1157, 1162 (9th Cir. 2012).

### B.  Relevant Medical Treatment and Examining Physicians' Evidence

#### 1.  *Michael Rockwell, M.D. and Northlight Counseling Associates*

Claimant began treatment at Northlight Counseling Associates on January 22, 2010.  (Doc. 10-9 at 145-149)  She had been hospitalized for approximately five days earlier that month due to depression, and had been prescribed medication.  (*Id.* at 145)  Her first appointment with Dr. Rockwell, who became her treating psychiatrist, was on February 22, 2010.  (Doc. 10-8 at 73-77)  He initially diagnosed her with a "long time combination of depression and anxiety," and prescribed Risperdal (a medication for schizophrenia and bipolar disorder) in addition to her existing prescriptions for Ambien (a sedative) and Effexor (an antidepressant).  (*Id.* at 77)  He recommended that she commence counseling  (*Id.*)  In March 2010, Dr. Rockwell noted that the Risperdal did not seem to be working and that a different medication should be attempted.  (*Id.*)  He assessed her suicide risk level as moderately high.  (*Id.*)  Later in March 2010, Dr. Rockwell again recommended changing her medication, as Claimant was not responding

well.  (*Id.* at 70)  He noted that Claimant's "depression remains severe [and] that she cannot return to work yet."  (*Id.*)

On April 16, 2010, Dr. Rockwell signed a "to whom it may concern" note, presumably advising Claimant's employer that she was "too symptomatic for work," and that he hoped medication adjustment would alleviate her symptoms so that she could return to work by May 17, 2010.  (*Id.* at 67)  On May 14, 2010, Dr. Rockwell noted that Claimant seemed somewhat improved, and documented that her medication would continue to be adjusted for "better depression coverage" and "better sleep/night time anxiety."  In June 2010, the doctor documented that Claimant's affect was restricted, and that she appeared to be depressed, anxious, and near tears, with a thought process that was normal in flow and content.  (*Id.* at 62)  A handwritten notation on Claimant's examination summary states, "She is now on LTD," possibly in reference to a "long-term disability" policy.  (*Id.*)  Dr. Rockwell reported in July 2010 that Claimant's medication had not improved her symptoms.  (*Id.* at 60)

In September and November 2010, the doctor indicated no significant change in Claimant's mental state.  (*Id.* at 51, 55)  On November 30, 2010, the doctor documented that Claimant's suicide risk level was "high."  (*Id.* at 49)  On February 24, 2011, Dr. Rockwell noted that Claimant's depression, crying, and anxiety were not improved, that her suicide risk remained high, and suggested that she begin a prescription for lithium (used to treat the manic episodes of bipolar disorder).  (*Id.* at 46)  At the same time, the doctor noted that at-home issues are "major contributors" to her mental state, and that he would like her to see a counselor.  (*Id.*)  Dr. Rockwell observed on March 24, 2011, that Claimant was still depressed or anxious, but not tearful on the prescription for lithium, and that her suicide risk had lowered to a moderately high level.  (*Id.* at 95)  On April 21, 2011, the doctor reported that Claimant's prescription for 900 mg of lithium was "helping" because she seemed only slightly depressed and not tearful, although she was speaking more slowly.  (*Id.* at 92)  He also noted that he planned to reduce her lithium dose.  (*Id.*)

On May 26, 2011, Dr. Rockwell recorded that after reducing Claimant's lithium dose, she showed no signs of sedation but she had "bad days" of crying and anxiety. (*Id.*) Consequently, he planned to increase her lithium dose. (*Id.* at 89)  In June 2011, the doctor observed that Claimant displayed some word retrieval issues, and reported feeling down at times but not teary, and had done some yardwork. (*Id.* at 87)  On August 25, 2011, Claimant was reported to have unintentionally lost 20 to 30 pounds due to elevated stress. (*Id.* at 86)  She was still on 900 mg lithium, but was depressed and tearful, and the doctor increased her perceived suicide risk to moderately high. (*Id.*)  Claimant's condition had only worsened by October 20, 2011, and the doctor documented that he would substitute one medication for another. (*Id.* at 84)  On December 15, 2011, Dr. Rockwell noted that Claimant reported that she had not returned sooner for an appointment because, in her paranoia, she thought the doctor was "out to kill her," and that she had stopped taking all medications because she could not eat, drink, or even talk, was crying daily, and could only sleep a couple of hours at a time. (*Id.* at 83)  The doctor assessed her suicide risk as "high."  He noted that Claimant opted to go back on her previous medications rather than try an antipsychotic prescription. (*Id.*)

Claimant's condition had improved on medication by January 5, 2012. (*Id.* at 82)  She reported that her ability to write had diminished, but that her paranoia had lessened, and that she was eating and having some good days. (*Id.*)  The doctor documented that her depressed state was mixed with some laughter, and that he planned to switch one of her depression medications. (*Id.*)  However, on February 2, 2012, Claimant displayed increased moodiness and anger, and Dr. Rockwell diagnosed her with bipolar traits. (*Id.* at 81)  Claimant's next visit was on June 28, 2012, during which the doctor noted that she was again off her medications, crying a lot more, and reporting that her husband wanted to leave her.  (Doc. 10-8 at 162)  The doctor indicated he would place Claimant on Abilify, an anti-psychotic medication.  (*Id.*)  By September 26, 2012, Claimant's symptoms had improved to the point that she said she was feeling better, doing more than usual, and that her depression was not a "10" anymore, but rather a "6 to 7." (*Id.* at 168)

On October 31, 2012, Dr. Rockwell observed that Claimant's anxiety was out of control, and that she reported that the presence of more than one or two persons in a room with her caused her to develop diarrhea or other feelings of sickness. (*Id.* at 170)

On November 30, 2012, Dr. Rockwell documented that Claimant's pulmonary doctor declined to fill out Social Security forms for her because she was not using her sleep apnea machine. (*Id.* at 180) He further noted that Claimant reported being frequently angry and that her medications did not help. (*Id.* at 180-181) He also reported that Claimant had threatened to ingest a full bottle of Restoril pills (a sedative), but eventually spontaneously surrendered the bottle. (*Id.* at 181) He noted that her mood was angry, intense, irritable, anxious, and sad/depressed. (*Id.* at 182) On January 16, 2013, Claimant reported having begun to use her CPAP machine nightly, and had experienced reduced sleepiness. (*Id.* at 158) He noted that Claimant not taken Valium (an anxiety medication) in several weeks, suggesting this was the reason her anxiety was "so high." (*Id.*) Although Claimant reported that her anxiety was "really high," Dr. Rockwell observed that her depression/anger was not as bad. (*Id.* at 159)

On March 13, 2013, Dr. Rockwell recorded that Claimant had been taking Saphris (a medication for schizophrenia and bipolar disorders) and Valium, and was using her CPAP machine, but still felt tired, was more depressed, that her anxiety very high, and that she had threatened suicide. (Doc. 10-9 at 99-100) He also recorded that she had not used her Viibryd (an antidepressant) prescription because she was too anxious about side effects. (*Id.* at 100) On March 29, 2013, however, the doctor noted that Claimant had taken Viibryd, which seemed to have helped. (*Id.* at 94) Claimant reported that she felt better, and that her depression had lifted somewhat. (*Id.*) She said that she had been to a bipolar support group twice. (*Id.*) The doctor reduced her suicide risk to moderate. (*Id.* at 95)

On April 26, 2013, Dr. Rockwell recorded that although Claimant was still taking Saphris and Valium, she had been exhausted and "down," and he assessed her suicide risk as increased to moderately high. (*Id.* at 89-90) During examinations in May 2013,

Dr. Rockwell documented Claimant's reports of her arguments with her husband, which had put her in a "murderous rage." (*Id.* at 84) He noted that Claimant displayed a dysphoric mood, and was irritable, sad and depressed. (*Id.* at 86) He also noted discussing a plan for a hospital program or visits with an individual counselor. (*Id.* at 79-80) On May 31, 2013, Dr. Rockwell reported that Claimant had been hospitalized for a week. (*Id.* at 73) He reported that the hospital physicians had altered Claimant's medications and that she was still crying, but was not as depressed. (*Id.* at 74) He lowered her suicide risk assessment to low/moderate. (*Id.* at 75) On July 1, 2013, Dr. Rockwell documented that Claimant had again been in the hospital for eight days in June 2013. (*Id.* at 69) He observed that Claimant was not crying but was still depressed. (*Id.*) He also noted that Claimant's daughter-in-law reported that Claimant was doing a lot better after leaving her husband, and had not demonstrated any mood swings. (*Id.* at 70)

On August 5, 2013, the doctor reported that Claimant had started to cry again, suffered panic and anxiety at a restaurant with her family, suffered from depression without anger or tension, and assessed her suicide risk as low. (*Id.* at 64-65) In September 2013, Claimant reported some agoraphobia and active depression, and said that she was seeing a counselor. (*Id.* at 59) The doctor assessed her suicide risk as low. (*Id.* at 60) In October 2013, Claimant told Dr. Rockwell that she experience both good and bad days with depression, that she had bad anxiety around the children, and that she had been able to leave her house, but only "as little as possible." (*Id.* at 54) On November 15, 2013, although Claimant reported having panic attacks and was always nervous, she said she was doing fairly well. (*Id.* at 49) The doctor noted she was a bit tearful and displayed a depressed affect, but that she was not overtly anxious. (*Id.*)

On January 17, 2014, Claimant reported that her down mood was not lifting. (*Id.* at 44) She said she was anxious and tired all the time, but had suffered no panic attacks. (*Id.*) Dr. Rockwell noted that Claimant was more tearful and depressed than at her previous appointment, and raised her suicide risk to low/moderate. (*Id.* at 45) In February 2014, the doctor recorded that Claimant was still down and angry at her

husband, and that her depression and anxiety symptoms were about the same. (*Id.* at 39) He documented that she reported no panic attacks or psychosis, and that she could not afford counseling but had attended Al-Anon meetings. (*Id.*) On March 7, 2014, Claimant appeared to be "low energy," depressed and tearful, but not overtly anxious. (*Id.* at 34) When Dr. Rockwell saw Claimant on April 9, 2014, he reported she was suffering from an intense, diffuse anger. (*Id.* at 29) He concluded that Claimant was more restricted and depressed than angry. (*Id.*) In May 2014, the doctor reported that Claimant said she had tried to take care of her grandson, and was too tired to take her medications and "now I am a mess." (*Id.* at 24) She said she had not taken Risperdal on days she was caretaking, which was three times per week. (*Id.* at 24) She reported active depression and that she was more tearful, and apathetic about minding the baby. (*Id.*) Dr. Rockwell raised her suicide risk assessment to moderate, and documented her having demonstrated "impaired judgment" because she had adjusted her medication without his input. (*Id.* at 25)

On June 4, 2014, the doctor reported Claimant's statements that she was feeling better, was not as tired, and was less anxious. (*Id.* at 19) He lowered her assessed suicide risk to low. (*Id.* at 20) A few days later, on June 9, 2014, Claimant called because she had experienced a really bad panic attack. (*Id.* at 17) She told Dr. Rockwell that she did not want to take Ativan (an anti-anxiety medication) if she did not have to. (*Id.*) On July 3, 2014, Claimant reported memory lapses, and that she had experienced five panic attacks lasting up to 30 minutes. (*Id.* at 13) The doctor noted that she had suffered some depression, but was not angry or anxious. (*Id.* at 14) During an office visit on July 30, 2014, Claimant reported having daily panic attacks and scattered thoughts. (*Id.* at 9) Dr. Rockwell noted that her hypersensitivity to sounds was "almost auditory hallucinations" and that she was more depressed. (*Id.*) On August 27, 2014, Doctor Rockwell reported Claimant had left her husband, that her panic and anxiety were not too bad, that she was not sleeping and was tearful and depressed, and raised her suicide risk assessment to moderately high. (*Id.* at 3-4)

## 2. *Arcadia Family Clinic*

Claimant was first seen at this practice on February 5, 2010, to follow up on her hospitalization in January 2010. (Doc. 10-8 at 100) The exam notes indicate both that Claimant was "[i]mproved but not all better on 225[mg] of [E]ffexor XR a day. To psych later this month," that she "[d]enies sadness or nervousness," and that her "mood is appropriate[,] [a]ffect normal." (*Id.* at 100-101) She was prescribed both Effexor (an anti-depressant and anti-anxiety drug) and Ambien (for insomnia). (*Id.* at 101) Claimant was next seen at this practice on December 30, 2011. (*Id.* at 102) The examination notes indicate she was seen to review her medications, and that she had "not respond[ed] well to [P]axil or Cymbalta [both depression and anxiety medications]." (*Id.* at 103) She had been prescribed lithium and Xanax (a treatment for anxiety and panic disorder) by her psychiatrist, Dr. Rockwell. (*Id.* at 102) The notes also indicate that Claimant "[d]enies depression and anxiety," and that her judgment, insight, memory, mood and affect "(i.e., depression, anxiety)" were all normal. (*Id.* at 103)

On January 19, 2012, Dr. Woellner documented that the "last [blood work] shows therapeutic lithium level" and that Claimant was "[t]ried on Seroquel [a treatment for schizophrenia, bipolar disorder and depression] but didn't do well on it." (*Id.* at 106) On February 13, 2012, Claimant was seen because she reported having troubles with her medication, had not been "on meds and is having a reaction." (*Id.* at 108) Although the doctor's review of symptoms continued to document that Claimant denied any depression or anxiety, and that her psychiatric status was normal, Dr. Woellner prescribed her to "go back on Seroquel until Dr. Rockwell sees." (*Id.* at 109-110) Subsequent to a follow up visit on March 12, 2012, Dr. Woellner's notes state that Claimant had done "better since starting meds, [S]eroquel XR has switched to[A]bilify 5." (*Id.* at 112)

On May 30, 2013, Claimant had blood drawn for testing in association with diagnoses of shortness of breath, anxiety and chest pain. (Doc. 10-9 at 173) She was assessed as "[p]ositive for behavioral problems, confusion and dysphoric mood. The patient is nervous/anxious." (*Id.* at 170) On June 27, 2013, she again was assessed as

having "behavioral problems, confusion and dysphoric mood," as well as appearing nervous and anxious. (*Id.* at 167) On October 30, 2013, she was seen by Dr. Woellner, whose exam notes indicate that Claimant was then taking prescriptions of Haldol and Risperdal (both anti-psychotics), Ativan (an anti-anxiety treatment), and Desyrel (an anti-depressant). (*Id.* at 164) At examinations in June and September 2014, Claimant continued to display behavioral problems, nervousness, anxiety and dysphoric mood. (*Id.* at 162, 159)

### 3. Family Service Agency

Claimant received counseling between May and August 2010 at the Family Service Agency. (Doc. 10-9 at 150-158) She was assessed as suffering from major depressive disorder. (*Id.* at 153)

## C. Hospitalizations

### 1. St. Luke's Behavioral Health Center

On January 4, 2010, Claimant was taken to the hospital by her husband because she demonstrated a worsening depressed mood, with suicidal ideation. (Doc. 10-8 at 12) She later explained that she felt she needed medications, she had been very tired working two jobs, was unable to sleep or eat, and that an incident at work had made her feel she could not "handle it anymore." (*Id.* at 29) She had impulsively quit her job the night before. (*Id.* at 12) The hospital's notes indicated that Claimant had stopped taking her medications about a year prior because the antidepressants made her tired. (Doc. *Id.* at 36) She was assessed as having an intact memory, but with psychomotor slowing, slowing of speech, a constricted affect and depressed mood, and was positive for suicidal ideation with intent and plan. (*Id.* at 13) On discharge, Claimant was assessed as anxious, with appropriate affect, reality-based perceptions, fair judgment, intact memory and lacking suicidal ideation. (*Id.* at 7) The discharge notes indicated that medication had improved Claimant's mood and sleep. (*Id.*)

### 2. *Valley Hospital*

Records indicate that Claimant was admitted to Valley Hospital on May 17, 2013, and discharged on May 24, 2013. (Doc. 10-9 at 135) She was referred by Dr. Rockwell for "treatment and evaluation secondary to suicidal ideation." (*Id.*) Her admitting diagnosis was bipolar disorder and generalized anxiety disorder. (*Id.*) Claimant was documented as stating she was not compliant with her prescriptions because they "weren't working" and she "cannot afford these medicines anyway." (*Id.*) After adjustment of her medication over her hospital stay, Claimant was discharged in stable condition. (*Id.* at 136) She was documented as suffering no "acute signs and symptoms," or suicidal ideation. (*Id.* at 137) Her affect was noted as both appropriate and blunted, but her mood was "much better." (*Id.*) Claimant's thought process was logical, her judgment intact, and her insight partial. (*Id.*) Her GAF score upon admission was 25 to 30, and on discharge had improved to 45 to 50. (*Id.* at 135, 137)

The following month, on June 17, 2013, Claimant presented again to Valley Hospital and reported she experienced suicidal ideation and that her medications were not working. (*Id.* at 116) She was noted as having attended an intensive outpatient program at the hospital for the previous three weeks. (*Id.*) She stated she had stopped all medications two weeks prior because she believed they were not effective. (*Id.*) It appears that Claimant was discharged from the hospital on June 24, 2013. (*Id.* at 121) Claimant completed the intensive outpatient program on September 12, 2013. (*Id.* at 119) An assessment of her progress while in the program indicated that Claimant improved in her "mood, thinking and behavior, communication skills" and reported improvement in regulating her mood by using coping skills. (*Id.* at 119) Her completion notes further indicated that her "self-esteem improved and social anxiety has decreased since the date of admission to [the intensive outpatient program]." (*Id.*)

### D. Treating Psychiatrist's and Examining Consultants' Assessments

#### 1. *Monte L. Jones, M.D.*

On August 16, 2011, Claimant was examined by Dr. Jones in connection with a prior application for disability benefits. (Doc. 10-8 at 145-152) Dr. Jones diagnosed Claimant with mental issues, and side effects of medication, including slow mental process and intermittent tremors. (*Id.* at 148) In the "Medical Source Statement of Ability to Do Work-Related Activities (Physical)" form he completed on August 19, 2011, Dr. Jones found that Claimant was subject to essentially no physical limitations, but concluded that "she does have mental issues and mentation limitations. Her thinking is very slow, too slow. I feel this is genuine." (*Id.* at 150)

### 2. *James Huddleston, Ph.D*

On August 14, 2012, Claimant saw James Huddleston, Ph.D., for a single psychiatric consultation and mental status examination in connection to the instant application for disability benefits. (Doc. 10-8 at 135-144) Dr. Huddleston, a licensed psychologist, performed a clinical interview, mental status examination, and review of Claimant's available medical records. (*Id.* at 135) Dr. Huddleston concluded that her recurrent depressive disorder and generalized anxiety disorder were "moderate in severity" and would likely cause functional limitations, including difficulty sustaining attention and concentration, and managing high stress. (*Id.* at 141-142)

Dr. Huddleston completed a "Psychological/Psychiatric Medical Source Statement." (*Id.* at 143) He concluded that Claimant suffered from a condition or conditions that would limit her ability to work. (*Id.*) The doctor indicated that Claimant's limitations included: (1) mild impairment in short-term memory, "due in large part to difficulty in paying attention"; (2) moderate impairment in maintaining sustained concentration and persistence "due to depression and anxiety that affect cognitive functioning"; and (3) a likelihood that she would have "difficulty functioning in circumstances involving extreme stress or conflict." However, he opined that she was able to: (1) "understand and remember simple to moderately complex instructions, locations and procedures"; (2) "carry out simple to moderately complex tasks without

special supervision"; (3) "get along with co-workers"; and (4) "adapt adequately to changes in the work environment, and to be aware of hazards." (*Id.*)

### 3. Michael Rockwell, M.D.

Dr. Rockwell, Claimant's treating psychiatrist, completed a "Medical Assessment of the Patient's Ability to Perform Work Related Activity" form on November 1, 2012. (*Id.* at 154-155)   He assessed moderately severe limitations in Claimant's ability regarding:  (1) responding appropriately to co-workers; (2) responding to customary work pressures; and (3) completing "a normal workday/workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number/length of rest periods." (*Id.*)  Dr. Rockwell opined that Claimant suffered severe limitations in her ability to:  (1) relate to other people ("when symptomatic"); and (2) respond appropriately to supervision ("at times").  He offered the comment that Claimant "feels if trained, she could do some work – wants to do so / willing to try." (*Id.* at 155)

Subsequently, in September 2014, Dr. Rockwell completed an updated medical assessment form.  (*Id.* at 182-183)  At this point, Dr. Rockwell indicated that Claimant was severely limited in:  (1) her ability to relate to other people; (2) the estimated degree of deterioration in her personal habits; (3) her ability to respond appropriately to co-workers; (4) her ability to respond to customary work pressures; and (5) her ability to complete a workday or workweek without interruptions from psychologically based symptoms, or to perform at a consistent pace without unreasonable numbers or length of rest periods. (*Id.*)  The doctor also opined that Claimant was subject to moderately severe limitations in her ability to:  (1) respond appropriately to supervision; and (2) perform complex tasks. (*Id.*)  Dr. Rockwell included a comment that Claimant was subject to "chronic depression/anxiety with brittle mood swings to anger and self-destructive behaviors." (*Id.* at 183)  Dr. Rockwell also provided Claimant with a letter dated September 14, 2014, "written to support her disability status," that stated:

I have worked with [Claimant] for many years. Despite time and treatments she remains symptomatic for depression, anxiety, and angry mood swings. These are intense and disabling. I have never seen her get to the point she could function at any sort of job. In my opinion she qualifies for disability; no doubts on my part.

(*Id.* at 184)

### E. Non-examining State Agency Medical Consultant Assessments

#### 1. *Sheri Tomak, Psy.D.*

Upon review of Claimant's record, including the medical source opinions of Drs. Monte Jones and James Huddleston, on August 30, 2012, Sheri Tomak opined that Claimant was not disabled. (Doc. 10-4 at 2-17) Relying on Dr. Huddleston's consultative exam, Dr. Tomak concluded that Claimant was capable of performing "simple types of job tasks." (*Id.* at 17)

#### 2. *Margaret Friedman, Psy.D.*

On reconsideration, on April 12, 2013, the record now included the 2012 medical assessment provided by Dr. Rockwell. (*Id.* at 28) Dr. Friedman concluded that while Claimant experienced "some discomfort and difficulty due to her conditions," she was not significantly restricted in her mobility and ability to perform daily activities. (*Id.* at 36) Dr. Friedman further opined that while Claimant would be unable to perform some types of work, she was capable of performing "other work with limited contact with others." (*Id.*)

## II. STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), this court must affirm the Commissioner's decision to adopt the ALJ's findings if his findings are supported by substantial evidence and are free from reversible error. *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007). "Substantial evidence is more than a mere scintilla, but less than a preponderance." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1998). "It is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison v. NLRB*, 305 U.S. 197, 229 (1938)).

In determining whether substantial evidence supports the ALJ's decision, the Court considers the record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusions. *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1988). The ALJ is responsible for resolving conflicts in medical testimony, ambiguity in the record, and determining credibility. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). If there is sufficient evidence to support the ALJ's outcome, the Court cannot substitute its own determination. *See Young v. Sullivan*, 911 F.2d 180, 184 (9th Cir. 1990). Although the Court "must do more than merely rubberstamp the ALJ's decision[,]" *Winans v. Bowen*, 853 F.2d 643, 645 (9th Cir. 1988), where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be upheld. *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989) (citations omitted).

## III.   LEGAL STANDARDS

Claimant bears the burden of proving disability under the Social Security Act. *Tidwell v. Apfel*, 161 F.3d at 601. She meets this burden if she can establish that she has a physical or mental impairment that prevents her from engaging in any substantial gainful activity and that is expected to result in death or to last for a continuous period of at least one year. 42 U.S.C. §§ 423(d)(1) and 1382c(a)(3)(A). Claimant's impairments must be such that she is not only unable to perform her past relevant work, but also that she cannot, considering her age, education and work experience, engage in other substantial gainful work existing in the national economy. 42 U.S.C. §§ 423(d)(2) and 1382c (a)(3)(B).

The Commissioner applies a five-step sequential process to evaluate disability. 20 C.F.R. §§ 404.1520 and 416.920. In the first three steps, the Commissioner determines: (1) whether a claimant has engaged in substantial gainful activity since the alleged onset; (2) whether she has a "severe" impairment or a combination of impairments that is "severe"; and (3) whether the severity of any impairment meets or equals the severity of any impairment in the Listing of Impairments (20 C.F.R. Pt. 404, Subpt. P, App. 1). *Id.* If a claimant complies with these three steps, she will automatically be found disabled; if

that claimant satisfies steps one and two but not three, she must then satisfy step four. *Id.*

Before considering step four, the ALJ must assess the claimant's residual functional capacity ("RFC"), *see* 20 C.F.R. § 404.1520(a)(4)(iv), which is "the most [the claimant] can still do despite [the claimant's] limitations." *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1097 (9th Cir. 2014) (quoting 20 C.F.R. § 404.1545(a)(1)). The RFC assessment is "based on all the relevant medical and other evidence" in the claimant's record. *Id.* (quoting 20 C.F.R. § 404.1520(e)). In determining a claimant's RFC, the ALJ must consider all of a claimant's medically determinable impairments, including those that are not severe. 20 C.F.R. § 404.1545(a)(2).

At step four, the ALJ considers the claimant's RFC and past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If a claimant is able to perform her past relevant work, she is not found to be disabled. *Id.*

When a claimant satisfies step four, the burden shifts from her to the Commissioner to establish the claimant is capable of performing other work in the national economy. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (claimant bears the burden of proof on the first four steps, but the burden shifts to the Commissioner at step five). The fifth and final step involves the ALJ's decision whether a claimant is able to make an adjustment to other work, given the ALJ's assessment of the claimant's RFC and age, education and work experience. 20 C.F.R. § 404.1520(a)(4)(v).

## IV.  ADMINISTRATIVE HEARING

Administrative Law Judge Thomas Cheffins conducted a hearing on Claimant's application on September 25, 2014. (Doc. 10-3 at 47-78) Claimant testified that she currently lived with her son, daughter-in-law and grandchild, received food stamps and obtained medical insurance coverage through AHCCCS (Arizona's Medicaid agency). (*Id.* at 56) She explained she had last worked in December 2009 as a care giver to the elderly. (*Id.* at 57) She further stated that she stopped working after she was called upon to help a care center resident use the bathroom, which was a "two-person transfer" but Claimant was working alone. (*Id.*) When questioned about the health condition that

most affects her ability to work, Claimant explained, "I just don't function. I cry. I just stay away from people." (*Id.* at 58)

On questioning from her counsel, Claimant testified that she left her house only twice a week for any reason, and typically left to see her doctor or obtain counseling. (*Id.* at 59) She declared that she usually only took her medications when someone else was around because of the side effects. (*Id.* at 60) She explained that she had been hospitalized for psychiatric symptoms the previous year, and that she had recurring thoughts about harming herself. (*Id.* at 60-61) Claimant said she was tired all the time and woke up at night a lot. (*Id.* at 61) When asked if she thought the cause was mental or physical, she said she did not know. (*Id.*) She averred that she had troubles concentrating on and completing tasks because her thoughts were "scrambled." (*Id.*)

Claimant was asked whether she could perform a job that permitted her to work a job that isolated her from other people. (*Id.* at 61-62) She said she was not sure if she would be able to even "get up and go" to a job. (*Id.* at 62) Claimant said she did not take criticism well. (*Id.*) She said that she had bathed only about four times during the prior couple of months, and did not socialize. (*Id.* at 63) Noting that she had recently separated from her husband, Claimant testified that her symptoms of anxiety and panic attacks had lessened, but that her depression might be "more prevalent." (*Id.* at 64) She noted that she had panic attacks about three times weekly, each lasting about an hour. (*Id.*)

When asked if she were using her CPAP machine for her obstructive sleep apnea symptoms, Claimant said that currently she was not using it, although she "should be." (*Id.*) Her reason for not using the CPAP machine was that she had no place to store it in her son's home. (*Id.*) Although she recounted that at one time she had cared for her grandchild, she said it was "too much" for her because she "couldn't handle the stress of something happening to him." (*Id.* at 65) She agreed that her ability to drive had improved since a prior period when she had been unable to drive or leave the house. (*Id.* at 65) Claimant stated that she smoked about two packs of cigarettes daily. (*Id.* at 66)

- 16 -

Upon further questioning from the ALJ, Claimant said that she had left the house and gone places more than twice a week in the past month, as well as during an earlier point in time. (*Id.* at 66-67) She also clarified that earlier, when she cared for her grandson at home with her husband, it was normally for just a few hours at a time. (*Id.* at 67-68) Additionally, Claimant said that when she had quit her last job, she did not try to regain the job because she "couldn't face them." (*Id.* at 69) Claimant explained that her symptoms fluctuated from day to day so that she could leave her house more often during a good week than during a bad week. (*Id.* at 69) She stated that she still suffered three to four days each week when she just sits all day and does nothing. (*Id.* at 70)

The Vocational Expert ("VE") classified Claimant's past work as an office manager as sedentary, skilled work, and her work as a home health aide as heavy, semi-skilled work. (*Id.* at 71-72) The ALJ posed to the VE a hypothetical involving an individual of Claimant's age, education and work experience, able to perform light work and further able to: (1) understand, carry out, and recall simple work instructions and procedures; (2) respond appropriately to changes in basic work settings; (3) be organized and set goals; and (4) respond appropriately to supervision, co-workers, and work situations. (*Id.* at 72) The ALJ also posed that this hypothetical individual would be subject to the postural limitations of: (1) no climbing of ladders, ropes or scaffolds; (2) occasional climbing of ramps and stairs; and (3) the ability to frequently crawl. Finally, the ALJ described the environmental limitations for the individual as the need to avoid concentrated exposure to: (1) extreme temperatures, wetness and humidity; (2) irritants such as fumes, odors, dust and gases; or to (3) hazardous machinery and unprotected heights. (*Id.*) The VE confirmed that this hypothetical profile would preclude Claimant's past work. (*Id.*) However, the VE identified other work in the national economy that would fit the profile, including assembler, inspector and packager. (*Id.* at 73)

The ALJ posed to the VE an additional hypothetical profile. (*Id.*) This hypothetical was the same as the first, but included mental health limitations opined by

Dr. James Huddleston in his medical source statement. (*Id.*; Doc. 10-8 at 143) As noted above in Section I.D.2, these limitations included: (1) mild impairment in short-term memory and the ability to understand and remember simple to moderately complex instructions, locations and procedures; (2) moderate impairment in sustained concentration and persistence, such that she is able to carry out simple to moderately complex tasks without supervision, and would have difficulty in conditions involving extreme stress or conflict; (3) mild impairment regarding social interaction, but potentially limited in situations involving high stress or confrontation; and (4) mild impairment adapting to changes in the work environment and in awareness of hazards. (*Id.*) The VE opined that the same jobs he listed in connection with the first hypothetical would equally apply to the second hypothetical. (*Id.* at 73-74)

Claimant's counsel then posed a hypothetical based on the psychiatric assessment of Claimant's treating psychiatrist, Dr. Rockwell. (*Id.* at 74-75) Dr. Rockwell's assessment included that Claimant suffered extreme impairment in her ability to function in areas involving: (1) relating appropriately to other people; (2) her personal habits; (3) responding appropriately to co-workers and to customary work pressures; and (4) competing a normal workday or workweek without impacts from psychologically based symptoms, and performing at a consistent pace without undue rest periods. (Doc. 10-9 at 182-183) Dr. Rockwell's assessment also evaluated Claimant as limited by impairments that seriously affect her ability to function in the areas of: (1) responding appropriately to supervision; and (2) performing complex tasks. (*Id.*) The VE opined that a person subject to such limitations would not be able to "sustain work with continuity." (Doc. 10-3 at 75) The VE advised Claimant's counsel that an employee would not likely be able to maintain employment if the employee sustained more than one unauthorized absence per month. (*Id.* at 75-76)

## V. ALJ's DECISION

The ALJ issued his unfavorable decision on November 19, 2014. (Doc. 10-3 at 17-41) He found that Claimant met the insured status requirements of the Social Security

Act through March 31, 2015 (*Id.* at 21, 23), and that she had not engaged in substantial gainful employment since December 31, 2009, her alleged onset date. (*Id.* at 23) The ALJ found that Claimant suffered a severe combination of impairments, including obstructive sleep apnea, stable pulmonary nodules, chronic obstructive pulmonary disease (COPD)/asthma, tobacco abuse, post-traumatic stress disorder, anxiety and depression and/or bipolar disorder. (*Id.*) The ALJ further found that Claimant did not "have an impairment or combination of impairments" meeting or medically equaling the severity of a listed impairment. (*Id.* at 26-28)

The ALJ concluded that Claimant maintained the RFC to:

> Perform light work . . . except that she has the following non-exertional limitations. She cannot climb ladders, ropes or scaffolds; she can occasionally climb ramps and stairs and she can frequently crawl. She must avoid concentrated exposure to extreme heat and extreme cold, wetness and humidity, pulmonary irritants such as fumes, odors, dusts and gases, and hazardous machinery and unprotected heights. Mentally, the claimant has the mental abilities and limitations suggested at [Doc. 10-8 at 143, Dr. Huddleston's medical source statement]. She can understand and remember simple to moderately complex instructions, locations and procedures without special supervision. She can carry out simple to moderately complex tasks without special supervision. She would likely have difficulty functioning in social circumstances involving extreme stress or conflict. The claimant likely is able to adapt adequately to changes in the work environment, and to be aware of hazards.

(*Id.* at 268) The ALJ accepted the VE's opinion that Claimant would be unable to perform any of his past relevant work. (*Id.* at 39) However, the ALJ determined that Claimant was capable of "making a successful adjustment to other work that exists in significant numbers in the national economy[,]" including the positions of assembler, inspector, and packager. (*Id.* at 40)

## VI. DISCUSSION

Claimant argues that the ALJ erred by improperly: (1) rejecting Claimant's symptom testimony; and (2) rejecting the assessments of Claimant's treating psychiatrist, Dr. Rockwell. (Doc. 16 at 1) Each argument is addressed in turn.

**A.     Whether the ALJ erred by rejecting Claimant's symptom testimony**

In his evaluation of Claimant's credibility involving her subjective symptoms, the ALJ must have applied a two-step analysis. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007)).   Initially, the ALJ "must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* at 1036 (citation and internal quotation marks omitted).   If the claimant meets the first test and there is no evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons doing so." *Id.* (citation and internal quotation marks omitted).

The ALJ found Claimant's "medically determinable impairment could reasonably be expected to cause the alleged symptoms[,]" but also found that her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (Doc. 10-3 at 30)   The ALJ devoted a significant portion of his decision to discussing his finding that Claimant's alleged physical limitations were either inconsistent with the medical record, or not credible. (*Id.* at 30)   However, Claimant alleged it was her mental conditions of major depressive disorder, generalized anxiety and symptoms of Post-Traumatic Stress Disorder that limited her ability to work, not her physical limitations. (*See*, *e.g.,* Doc. 10-7 at 6)

Addressing Claimant's allegations of significant mental symptoms, the ALJ concluded that Claimant's allegations were "not consistent with the chart notes from providers other than [Dr. Rockwell] and counselors at Northlight Counseling." (Doc. 10-3 at 31)   The only examples given by the ALJ of inconsistencies by other providers regarding Claimant's mental symptoms came from the medical records of Arcadia Family Clinic, where Claimant was seen intermittently between February 2010 and October 2013. (*See* Section I.B.2, supra)   The ALJ specifically relied on a number of instances in which the Arcadia Family Clinic records documented Claimant as having denied experiencing mental symptoms, and in which the exam notes also reported that no

psychiatric symptoms were observed. (Doc. 10-3 at 31-32) Although the ALJ acknowledged that in May, June and October 2013, and again in June and September 2014, this practice indicated that Plaintiff reported psychiatric symptoms and exhibited anxiety and nervousness, he discounted these records by stating that Claimant had "an issue of non-compliance." (*Id.* at 32) The non-compliance with treatment and medical advice apparently referenced by the ALJ consisted of: (1) time gaps between Claimant's visits to this clinic; (2) her failure to use her CPAP machine while residing in her son's home; and (3) Claimant's testimony that she continued to smoke two packs of cigarettes a day and had not been to see her pulmonary doctor in "awhile." (*Id.* at 33) As noted, however, these instances of allegations of non-compliance each involve Claimant's physical health and symptoms and have no direct correlation to the Clinic's documentation of her psychiatric symptoms.

The ALJ also enumerated instances of non-compliance by Claimant with mental health treatment. He listed: (1) instances when Claimant did not keep appointments, or did not make appointments at the recommended intervals; (2) several instances when Claimant had ceased taking all or only some of her prescriptions for a variety of reasons; (3) one instance when Claimant self-adjusted her prescription dose; and (4) that Claimant stated she could not pay for mental health counselling because she could not afford it, but persisted with a two-pack-a-day cigarette addiction. (*Id.* at 34)

The ALJ also concluded that Claimant's testimony regarding the severity of her symptoms was less than fully credible because: (1) some of her symptoms were not continuous (*Id.* at 32); (2) her symptoms seemed to be triggered by stressors within her home and family (*Id.* at 32-33); and (3) he concluded that her issues with poor sleep patterns were not entirely caused by her mental impairments, but were also the result of her diagnosed sleep apnea, the symptoms of which she only sporadically treated by using her CPAP machine (*Id.* at 33). The ALJ additionally cited Claimant's perceived inconsistent testimony or other statements involving: whether she experienced anger; how often she bathed; how often she left her home; and that she had not mentioned her

activities included swimming, yet she once had complained of back pain after climbing out of a pool. (*Id.* at 35) The ALJ also relied on evidence that the claims representative taking Claimant's telephonic disability benefits application noted that Claimant had been "cooperative and pleasant" and answered all the questions posed "without difficulty." (*Id.*)

The ALJ also concluded that Claimant's "activities of daily living are inconsistent with the level of physical and mental dysfunction she suggests." (*Id.* at 30) He enumerated evidence that: (1) she had been able to care for three small dogs in the past; (2) she had been able to spend some time caring for her grandchild at home; (3) she was able to shop; and (4) she was able to pay bills, prepare simple meals, mop, do laundry, wash dishes, and drive by herself. (*Id.*)

The Court finds that the ALJ failed to offer specific, clear and convincing reasons for rejecting Claimant's symptom testimony regarding limitations caused by her depression, anxiety, and other mental health issues. His reliance on evidence of Claimant's activities of daily living is misplaced. The record does not indicate that Claimant had been able "to spend a substantial part of [her] day engaged in pursuits involving the performance of physical functions that are transferable to a work setting." *Ghanim v. Colvin*, 763 F.3d 1154, 1165 (9th Cir. 2014) (citations and internal quotation marks omitted). Claimant's description of her daily activities is not inconsistent with her testimony of her mental health issues and the limitations she suffers. To the extent that Claimant's symptoms were not continuous,

> it is error to reject a claimant's testimony merely because symptoms wax and wane in the course of treatment. Cycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working.

*Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014). Moreover, "[t]hat a person who suffers from severe panic attacks, anxiety, and depression makes some improvement does

not mean that the person's impairments no longer seriously affect her ability to function in a workplace." *Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th Cir. 2001).

Additionally, the ALJ's reliance on Claimant's bouts of non-compliance with her prescriptions to support his conclusion that Claimant was not entirely credible regarding the intensity, persistence and limiting effects of her symptoms also was error. The Ninth Circuit instructs that "we do not punish the mentally ill for occasionally going off their medication when the record affords compelling reason to view such departures from prescribed treatment . . . at least in part a result" of underlying psychiatric issues. *Garrison*, 759 F.3d at 1018 n. 24 (9th Cir. 2014). Here, the record indicates that Claimant went off her medications during a time when she also did not see the doctor because she thought he was out to kill her. (Doc. 10-8 at 83) She also explained that she was not taking pills for a time because her anxiety prevented her from swallowing them. (*Id.* at 158, Doc. 10-9 at 100) Moreover, after Claimant's disability onset date, the periods during which she stopped taking her medications were not prolonged, and invariably resulted in worsened symptoms for which she promptly sought medical care. (*See, e.g.*, Doc. 10-8 at 83, 158-159, 162; Doc. 10-9 at 94, 100)

As for evidence that Claimant: (1) denied experiencing anger; (2) provided inconsistent testimony on how often she bathed; (3) said she left her home twice a week rather than four times a week; (4) was less than credible because she never mentioned swimming; or (5) appeared "cooperative and pleasant" to the claims representative and readily answered questions, the Court finds this evidence is not adequately substantial to support the ALJ's finding that Claimant's was not credible. As is set forth above, the Court finds the reasons the ALJ relied on to reject the severity of Claimant's symptoms are not clear and convincing.[2]

---

[2] This clear and convincing standard is the most heightened standard in Social Security law. *Moore v. Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002).

**B.      Whether the ALJ erred by rejecting the opinions of Dr. Rockwell**

The ALJ accorded either "no weight" or "very limited weight" to the medical opinions of Claimant's treating psychiatrist, Dr. Rockwell. (Doc. 10-3 at 38)  In contrast, the ALJ gave "substantial weight" to the examining consultative opinion of Dr. Huddleston, and "some weight" to the opinions of non-examining state agency medical reviewers, Drs. Tomak and Friedman. (*Id.* at 37)

Because treating doctors are employed to cure and have a greater opportunity to know and observe the patient as an individual, their opinions generally are accorded greater weight than the opinions of other physicians. *Rodriguez v. Bowen*, 876 F.2d 759, 761 (9th Cir. 1989).  However, the weight given a treating physician's opinion depends on whether it is supported by sufficient medical data and is consistent with the record. *See* 20 C.F.R. § 404.1527(d)(2).  If a treating physician's opinion is "inconsistent with other substantial evidence in the record" or "is not well supported," it should not be accorded controlling weight. *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007).

Where a treating physician's opinion is not controverted by another physician's opinion, an ALJ may reject the treating physician's opinion by giving clear and convincing reasons for doing so that are supported by substantial evidence. *Bayliss v. Barnhart*, 495 F.3d 1211, 1216 (9th Cir. 2005).  Where there is conflicting physician testimony, an ALJ can reject a treating physician's opinion by providing "specific and legitimate" reasons supported by substantial record evidence for such rejection. *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) (quoting *Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 2008)).  An ALJ will meet this burden by providing a "detailed and thorough summary of the facts and conflicting clinical evidence" and by indicating his interpretation of this evidence, along with his findings. *Id.* (citation omitted).  "Where an ALJ does not explicitly reject a medical opinion or set forth specific, legitimate reasons for crediting one medical opinion over another, he errs. *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (citing *Nguyen v. Chater*, 100 F.3d 1462, 1646 (9th Cir. 1996)).

Here, Dr. Rockwell's medical opinions are controverted by that of one-time examining psychologist, Dr. Huddleston. (Doc. 10-8 at 135-144) Accordingly, the ALJ needed to set forth specific, legitimate reasons for crediting the opinion of Dr. Huddleston over those of Dr. Rockwell.

The ALJ addressed Dr. Rockwell's November 2012 medical assessment, and found some of the opinions within that assessment to be internally inconsistent. First, the ALJ found that Dr. Rockwell's statements in the February to April 2010 period regarding whether Claimant would be able to return to her caregiver job contained inconsistent conclusions. (Doc. 10-3 at 37) These statements, taken in context, do not support the ALJ's finding. Rather, Dr. Rockwell's statements reflect nothing more than his hopeful medical opinion that adjustments in Claimant's medications could quickly moderate her symptoms and mental limitations to the point that she would be able to return to her job. That his hopes were not realized despite his treatment of Claimant's symptoms does not support a finding of inconsistency.

The ALJ also accorded very limited weight to Dr. Rockwell's November 2012 opinion, because the doctor had noted that Claimant had severe impairment in her ability to relate to other people when she was "symptomatic," and that she would have severe limitations responding appropriately to supervision "at times." (*Id.*) Additionally, the ALJ found an inconsistency between Dr. Rockwell's comment that Claimant felt that if she were trained, she could do "some work – wants to do so/willing to try" and the doctor's assessments of severe and moderately severe impairments. (*Id.*) When the ALJ asked Claimant what type of training she had been hoping to obtain, she indicated she did not have any specific training in mind, and that she just wanted "to be normal." (*Id.* at 77)

The Court finds the ALJ's reasons for according limited weight to Dr. Rockwell's 2012 medical assessment are not legitimate. Even though Dr. Rockwell qualified his assessment of two of Claimant's impairments, he nevertheless found moderately severe limitations in Claimant's ability to respond appropriately to co-workers, to customary work pressures, and to complete "a normal workday/workweek without interruptions

from psychologically based symptoms and to perform at a consistent pace without an unreasonable number/length of rest periods." (Doc. 10-8 at 154-155) These additional impairments were enough to establish disabling limitations. As for Claimant's expressed desire to try to do "some" work, the ALJ failed to demonstrate how this expressed desire undercut Dr. Rockwell's assessments of Claimant's psychiatric impairments. Moreover, the Ninth Circuit has held that unsuccessful attempts to work are not inconsistent with a finding of disability. *Lingenfelter v. Astrue*, 5045 F.3d 1028, 1037-38 (9th Cir. 2007). *See also Lewis v. Apfel*, 236 F.3d 503, 516 (9th Cir. 2001) (holding that "[i]n light of the entire record, [the claimant's] willingness to work more hours was not substantial evidence that he actually could work for twenty hours per week on a sustained basis.").

Regarding Dr. Rockwell's September 2014 medical assessment, the ALJ gave three reasons for finding that this assessment did not merit the significant weight it should "generally" otherwise be accorded. (*Id.* at 38) First, the ALJ found inconsistent Dr. Rockwell's findings on August 27, 2014, that Claimant "presented as anxious and depressed, with psychomotor retardation and slow speech," but also presented with "adequate" hygiene and grooming, a "cooperative and engaged" manner with "good eye contact," "organized, goal directed and linear" thought processes, and "intact" judgment. (*Id.*) Second, the ALJ determined that, to the extent Dr. Rockwell's opinions were based on Claimant's subjective complaints, the opinions merit no weight because "the claimant is not credible." (*Id.*) The ALJ observed that the doctor "did not address [C]laimant's non-compliance with the medication he prescribed or her failure to follow up with mental health counseling. . . . Instead, the doctor seems to have issued an opinion sympathetic to his patient." (*Id.*) Third, the ALJ faulted Dr. Rockwell for not reading the opinions of Dr. Huddleston and the state agency medical consultants, stating that he was therefore "unaware that the [C]laimant sometimes denied depression and anxiety, or that she alleged symptoms not supported by this record[.]" (*Id.*)

Respecting the ALJ's first reason for rejecting Dr. Rockwell's 2014 assessment, the ALJ did not either explain why the doctor's assessment was medically inconsistent, or

refer to substantial evidence in the record to support this rejection. Instead, he merely noted that because Claimant had recently separated from her husband, "some level of sadness/anxiety would be expected." (*Id.*) This conclusory reason is not a specific and legitimate reason supported by substantial evidence.

The ALJ's second reason for rejecting Rockwell's 2014 assessment was that, "to the extent [Rockwell's] opinions were based on the claimant's subjective complaints," the opinions lack merit because the ALJ deemed Claimant not credible. (*Id.*) However, this conclusion was wholly lacking in support. The ALJ did not provide substantial evidence to demonstrate that Dr. Rockwell's medical opinions were based on Claimant's subjective complaints rather than his own observations and judgments of her reported complaints. In fact, the examination notes for each appointment Dr. Rockwell had with Claimant include a section documenting Claimant's reports of her status and symptoms, followed by a separate section detailing the results of the doctor's mental status examination, which contained the doctor's professional assessments and conclusions about Claimant's appearance, behavior, motor ability, speech, mood and affect, thought processes and content, insight and judgment, and cognition. (*See, e.g.,* Doc. 10-8 at 157-161)

The ALJ also concluded that Dr. Rockwell's opinions were informed by sympathy to Claimant rather than his independent medical judgment. (Doc. 10-3 at 38) Again, the ALJ provided no evidence to support this conclusion. The Ninth Circuit has instructed that "[a]n ALJ may not assume that doctors routinely lie in order to help their patients collect disability benefits." *Popa v. Berryhill*, __ F.3d __, 2017 WL 3567827, at *5 (9th Cir. Aug. 18, 2017) (quoting *Lester*, 81 F.3d at 832).

The ALJ's third reason for his rejection of Dr. Rockwell's 2014 medical assessment was that Rockwell's opinions were not consistent with those of Dr. Huddleston and the non-examining state agency consultants. (Doc. 10-3 at 38) Again, the ALJ failed to provide specific and legitimate reasons supported by substantial evidence to support this position.

For the above reasons, the Court finds that the ALJ failed to provide specific and legitimate reasons supported by substantial record evidence for his rejection of either of Dr. Rockwell's 2012 or 2014 medical assessments and opinions. Accordingly, the ALJ erred in arriving at the RFC he applied to find that there were jobs Claimant could perform, and also erred in finding Claimant not disabled.

## VII. CONCLUSION

The decision to remand a case for additional evidence or for an award of benefits is within the discretion of this court. *Swenson v. Sullivan*, 876 F.2d 683, 689 (9th Cir. 1989). The court can remand a case with instructions to award benefits when:

> (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.

*Garrison*, 759 at 1020. Here, all three parts of this test are met. The record was fully developed and further administrative proceedings are unnecessary. The ALJ's decision did not provide legally sufficient reasons for rejecting both the opinion of Claimant's treating physician Dr. Rockwell and Claimant's own testimony. If the ALJ had credited these opinions and testimony as true, he would have been required to find that Claimant was disabled.

Accordingly,

**IT IS ORDERED that** the decision of the Commissioner of Social Security is **VACATED** and this matter is **REMANDED** to the Commissioner for an award of benefits as set forth in this Order.

. . .

. . .

. . .

**IT IS FURTHER ORDERED that** the Clerk of Court shall enter judgment accordingly.

Dated this 31st day of October, 2017.



David K. Duncan
United States Magistrate Judge

*Magistrate Judge Duncan signing for Magistrate Judge Fine